[Sac. No. 1324.  In Bank.—October 2, 1906.]

# JAMES WATERS, Respondent, v. D. C. POOL et al., Appellants.

SWAMP LAND — EQUITABLE CLAIMS OF SETTLERS — PREFERRED PUR-CHASERS.—Under the Swamp Land Act of April 4, 1870, all settlers upon swamp and overflowed lands belonging to the state, whose settlement is evidenced as in that act prescribed, have an equitable claim thereto, and are preferred purchasers thereof to the extent of their inclosure or occupancy.

ID.—AFFIDAVIT FOR PURCHASE—STATEMENT OF REQUISITES—TRUTHFUL-NESS.—An affidavit for the purchase of swamp land must state, among the requisites of the statute, that the affiant has not known of any legal or equitable claim to said lands other than his own, and all of the requisites of the statute must not only be· stated therein, but must be shown to be true, or no right to his land can be awarded by the court.

ID.—CONSTRUCTION OF AFFIDAVIT AND CERTIFICATE—ACTUAL SETTLE-MENT—UNTRUTHFULNESS NOT INTENDED.—Where prior to the segregation of the land by the United States government, the predecessor in interest of defendants, who had been the occupant of land lying on the left bank of the Sacramento River, in his affidavit of purchase and certificate described the land applied for as so situated, and also as being the fractional northwest quarter of section 19, which latter description included an island in the river known to be in the possession of plaintiff, and stated that he did not know of any legal or equitable claim to the land other than his own, the subsidiary description is not controlling, and it must be presumed after the lapse of thirty-six years without interference with plaintiff's possession, that the applicant only intended to apply for and take the land on the left bank of the river, and that he actually stated the truth as to his ignorance of any other claim thereto.

ID.—NEW SURVEY AND CERTIFICATE ON OLD AFFIDAVIT.—Where all rights were lost by plaintiff and defendants' predecessor by failure to comply with the statute, and the surveyor-general could approve any new survey and issue evidence of title thereto to any person applying to purchase the same, the old affidavit attached to the new survey and certificate, approved by the surveyor-general, limited to land lying on the left bank of the river, should be construed and measured by the same standard as if it be an entirely new affidavit bearing date as of the time of the approval of such survey.

ID.—CONFLICTING APPLICATION BY PLAINTIFF—EQUITABLE RIGHTS.—A conflicting application by plaintiff covering not only his island pos-session, but also all the land previously possessed by the grantor

of defendants, and included in his original certificate, ought not to be allowed to prevail as against the rights of the defendants' predecessor, and an equitable construction of the certificate which leaves to plaintiff and defendants their possessory rights to the lands which they were originally occupying should be adopted, and it was error to award the whole land to plaintiff on his conflicting application by reason of the falsity of the affidavit of defendants' predecessor.

APPEAL from a judgment of the Superior Court of Yolo County. Eugene P. McDaniel, Judge presiding.

The facts are stated in the opinion of the court.

Hudson Grant, for Appellants.

H. Clark, L. Schillig, and G. Clark, for Respondent.

THE COURT.—This is an action to determine the respective rights of plaintiff and defendants to certain swamp and overflowed land on reference by the surveyor-general to the superior court of Sutter County. Plaintiff had judgment for the entire tract in controversy, from which defendants appeal on bill of exceptions.

It appears that one Lars Johnson, on October 10, 1870, made affidavit before the county surveyor of Sutter County, and filed the same with said surveyor, declaring his desire "to purchase, under the provisions of an act to provide for the sale of certain lands belonging to the state, approved March 28, 1868, and the several acts amendatory thereof and supplemental thereto, a certain tract of swamp and overflowed land, *lying and situate on the left bank of the Sacramento River*, it being the fractional N. W. ¼ of section 19, tp. 11, N. R. 3 E. . . . and that he does not know of any legal or equitable claim, other than his own to the said lands." The court found on sufficient evidence that on July 18, 1871, at the request of said Johnson, said county surveyor surveyed said land, platted the same, and recorded said plat and filed notes of said survey in the records of swamp-land surveys in his office and numbered said survey No. 609 of Sutter County; on July 21, 1871, a copy of Johnson's application of said survey was filed in the office of the surveyor-general of the state, attached to a copy of Johnson's said affidavit; said plat, survey, and field-notes conflicted with the plat, survey, and field-notes of swamp-land survey No. 548 of Sutter County,—namely, the northwest

quarter of the northwest quarter of said section,—applied for by one McGriff, and Johnson's survey was not then approved, but was subsequently, by the surveyor-general, returned to the county surveyor of Sutter County, who, by his then deputy (formerly the county surveyor), altered and changed said plat and field-notes so that the same were made a plat and field-notes for a survey of the east half and fractional southwest quarter of the fractional northwest quarter of said section 19, omitting the McGriff forty-acre tract, and thereafter the said plat and field-notes so altered and attached to a copy of said affidavit of Johnson, were received by the surveyor-general, who, on September 9, 1873, indorsed the same, "Approved Sept. 9th, 1873. Robert Gardner, Surveyor-General"; that on October 20, 1873, said Johnson paid to the then county treasurer of said county, $24.56, being twenty per cent of the price of the land embraced in said survey No. 609, and also paid interest on the unpaid balance for one year (it appears by the evidence, however, that interest was paid to September 9, 1876); on November 13, 1873, the register of the state land office issued and delivered to Johnson certificate of purchase No. 3924 for the lands contained in said survey No. 609 as altered and changed, and no patent has ever been issued to Johnson or any other person for the lands in controversy.

It appears that plaintiff made application to purchase the land described in the Johnson certificate of purchase, on June 7, 1901, in which he made oath, among other things, that he "is and has been an actual settler and is now such actual settler on said lands, for upwards of thirty-five years; that during all said time he has actually resided on said lands with his wife and family or children; that he has improved the same by clearing about twenty-five acres and has at all times maintained his home on said lands since 1863; that there are adverse occupants of said land adverse to affiant [naming some of defendants], but they have been occupants of a portion of the land for more than sixty days since the plat of said lands was filed in the United States land office; that he knows the land applied for and its exterior boundaries and knows that there are settlers thereon other than himself, but the whole of said lands have been segregated for more than six months prior to making this application and filing this affidavit"; that said lands are suitable for cultivation; and that affiant is

an actual settler thereon. The court found the substantial averments of the affidavit to be true. The reference to the court was made July 11, 1901, and the complaint was filed September 7, 1901. The court found that the land was, on December 1, 1870, segregated by the United States, and that the plats showing the line of segregation were filed in the Marysville land office on that day, and the land was listed to the state as swamp and overflowed land on April 11, 1871, and on August 30, 1871, was patented to the state, and that said land was sectionized and the plats filed in the said land office prior to October 10, 1870. It was alleged in the complaint, and found by the court, that the Johnson affidavit was defective and void in this, that the statement therein as follows: "he does not know of 'any legal or equitable claim other than his own to the said land' was, is and at all times has been wholly false"; that the plaintiff was at the filing of said affidavit in possession and occupancy as his home of a certain portion of the land known as "The Island," situated in the southwesterly portion of the northwest quarter of said section, and that plaintiff occupied and had cultivated about seven acres and had his dwelling on the southerly portion of "The Island," and had an equitable claim to said island under the act of April 4, 1870, supplemental to the act of March 28, 1868, (Stats. 1869-1870, pp. 878, 879) ; and that said Johnson knew at the time he filed his said affidavits, of plaintiff's said possession and claim, and knew that plaintiff had a preferred right to purchase said tract known as "The Island," on which plaintiff now resides, and ever since 1856 has resided, using the same for farming purposes. It appeared that the island was at that date formed by the river surrounding it. Johnson died in 1880, after having conveyed his claim to an interest in said land and his certificate of purchase, and one Griggs and one Hawk, as tenants in common, succeeded to Johnson's rights, through whom defendants claim by mesne conveyances. The evidence was that Johnson lived on the portion across the river east of the island, and was farming the land, as did his successors also, and the relations of plaintiff to these people and the situation of the land leaves no doubt that plaintiff knew of the occupancy by Johnson, and defendants after him, of the lands not in his own possession. The court found that plaintiff was not a trespasser upon any part of the lands, and

that, at the time of his application in 1901, he "was an actual settler upon and claimed the whole of the land applied for and since said application has resided upon and claimed the whole of said lands applied for, and that plaintiff in good faith sought to purchase the lands described in his said affidavit, that he had substantial improvements upon said lands . . . and made said application to said lands in good faith." The court did not find directly on the issues as to the alleged knowledge of plaintiff, when he filed his application, that he, plaintiff, knew of Johnson's prior application, and knew that defendants were in good faith claiming the lands as successors of Johnson. The evidence showed that plaintiff must have known that defendants, as successors of Johnson, were claiming the lands now occupied by the plaintiff,—namely, the lands not embraced in the island tract,—and plaintiff's application states that there were other occupants of the land beside himself.

The court found that the land had been segregated at the time alleged in the answer,—to wit, December 1, 1870,—and that the approval of Johnson's said application by the surveyor-general and the issuance of said certificate of purchase to Johnson were in fact not done, given, or made within six months after the lands were so segregated. But the court found "that it is not true that plaintiff has lost his right to purchase said lands by any laches or by reason of not having made application to purchase the same from the state within ninety days of the filing of the said plats in the Marysville land office, showing the said line of segregation."

As conclusions of law the court found that the Johnson application and the approval thereof were void, and that the certificate issued to Johnson be annulled, and that plaintiff's application be approved and he be permitted to purchase the lands described therein, and judgment passed for plaintiff in accordance therewith.

The statutes in force when Johnson made his application were the act of March 28, 1868, (Stats. 1867-1868, p. 507, part II, secs. 28, 29, p. 514) and the act of April 4, 1870, supplementary thereto (Stats. 1869-1870, p. 878). The act of 1868 required the person making application to purchase swamp and overflowed land to state in an affidavit, among other things, "that he does not know of any legal or equitable claim to said lands other than his own; . . . which application and affi-

davit shall be filed in the office of the surveyor of the county in which such lands . . . are situate, who shall make survey of the land as required by section 18 of the act.'' The act of 1870 provides that ''All settlers upon the swamp and overflowed lands belonging to the state, whose settlement is evidenced by actual inclosure, or by ditches, plow-furrows or monuments, showing clearly the metes and bounds of their possessory claim, and the same are occupied for purposes of tillage or grazing, are hereby recognized as possessing an equitable claim to the land so inclosed or occupied by them, within the true intent and meaning of the act to which this is supplementary; and are declared preferred purchasers for such lands to the extent of such inclosure or occupancy.'' It is made the duty of the county surveyor to return surveys of such settlers to connect with the United States surveys. The act also provides that ''The surveyor-general of the state shall not approve, nor shall the register of the state land office issue, title for any swamp and overflowed land, until six months after the same shall have been segregated by authority of the United States, or of the state, by legislative enactment; and for ninety days after the filing of plats showing said line of segregation in the United States land office for the district in which the land is situate, the settlers possessing equitable claims under section one of this act shall be deemed preferred purchasers and shall file their applications for survey of their possessory claims with the county surveyor . . . within the said ninety days.''

It is well settled that in the purchase of state lands the requisites of the statute must be stated in the affidavit, and must be true, and that the hearing of a contest as to such lands must be shown to be true, or no right to the land can be awarded by the court. (*McKenzie* v. *Brandon,* 71 Cal. 209, [12 Pac. 428]; *Harbin* v. *Burghart,* 76 Cal. 119, [18 Pac. 127]; *Davidson* v. *Cucamonga Fruit Co.,* 78 Cal. 4, [20 Pac. 152], and many other cases.) At no time have defendants been entitled to patent, not having paid the purchase money and interest. The legal title to the land has at all times been, and now is, in the state. If Johnson acquired no right to any part of the land under his certificate of purchase the land was open to location in 1901, when plaintiff made application to purchase. Johnson's successors in interest stood in his shoes and

occupied no better or different relation to the land or to the state than did Johnson.

When this cause was submitted for decision to the appellate court of the third appellate district, Justice McLaughlin delivered the following opinion:—

"On October 10, 1870, nearly two months prior to the segregation of the land in controversy by the United States government, the predecessor in interest of the defendants made an affidavit stating his desire to purchase lands lying on the *left bank* of the Sacramento River, and *being* the *fractional* northwest one-fourth of section 19. This affidavit also contained the statement that he did not know of any legal or equitable claim to the land other than his own. The land was segregated from the public domain of the United States on December 1, 1870, and at that time the plaintiff was occupying *an island* which was entirely surrounded by the waters of the Sacramento River. The island was originally a peninsula connected with the mainland by a narrow strip or neck of land, but the river cut through this neck a few years prior to plaintiff's entry upon the land. The exact date of this severance does not definitely appear, but I regard this as unimportant, in view of the uncontradicted testimony of the plaintiff to the effect that 'The old river channel is deep and has always run all the way around the island.' (Transcript, fol. 167.) This testimony was designed to show that the land was so surrounded that an actual inclosure was unnecessary, but to my mind it convincingly demonstrates that Johnson, the mesne grantor of defendants, not only intended to but that he did actually state the truth when he expressed his desire to purchase land on the left bank of the river, and stated that he knew of no legal or equitable claim thereto other than his own. The main, central, controlling description of the land affiant had in mind when making his application and oath, and which he expressed a desire to purchase, was 'a certain tract of swamp and overflowed land on the *left bank* of the Sacramento River.' The subsidiary description 'it being the fractional northwest one-fourth of section 19' should not be given undue weight. Testing the truth of the statements made by the affiant thirty-six years ago, by the then existing conditions, it may reasonably be assumed that he knew little, if anything, about government subdivisions or the line of public surveys,

CXLIX Cal.—51

but he did know of that island in the river, which could not be said to be on either bank thereof. In order to convict this affiant—long since dead—of an untruth, we must not only disregard the general description in the affidavit, but must also place a technical meaning on the word 'fractional' as used in the subsidiary description. Thirty-six years have elapsed since the affidavit was made; the affiant's lips cannot speak his defense or explanation of the státements made; the land has passed through mesne conveyances to others; the plaintiff has slept for many years on rights he now asserts; and if there ever could be a case where rules of construction should be invoked in favor of innocence of untruth or crime or wrong, it is this. And it seems to me that the affidavit is reasonably susceptible of an interpretation which would acquit the affiant of perjury and relieve his successors from the results flowing from a contrary construction.

"But conceding that the statements in the affidavit were false, *when it was made,* there are cogent reasons for measuring their truth or falsity by conditions existing when it was *used* as the basis for the claim of title upon which appellants rely. Admitting that the plaintiff had a legal or equitable claim as a preferred purchaser to the land occupied by him when the affidavit was made and the land was segregated, such claim was forfeited before any action was had upon the false affidavit. The land was segregated on December 1, 1870, and the plaintiff was by law given ninety days from that date to make his application. After March 1, 1871, he could assert no lawful or superior right to this land as against any applicant having the necessary qualifications. On June 1, 1871, the surveyor-general could approve *any* survey and issue evidence of title thereto to any person applying to purchase the same. It results that when the survey was made at Johnson's instance, on July 18, 1871, the plaintiff had, by lack of diligence in the assertion of rights reserved to him for a limited period, lost his claim or right to preference, and any person could then assert that he had no preferred legal or equitable claim to the land he occupied. On that date it might be said that he had no legal or equitable claim to such land. On July 21, 1871, when the survey made at Johnson's request was received at the state land office, the affidavit to which such survey was attached was in its essence true. But at that time, the survey

was found to conflict with another survey made by the same official, and approval was refused and the papers were returned. This was, to all intents and purposes, the end of the matter, and the finale of all proceedings initiated by the affidavit. Strictly speaking, and the plaintiff invokes and relies upon strict construction of rules and papers, Johnson's application had failed and proven abortive, and he too had lost his preferential rights. In strictness, a new application and survey were necessary. Matters were allowed to rest as they were when the papers were returned for more than two years. The approval of a new survey on September 9, 1873, shows that during this time no application for purchase or survey of this land was made by any person. On that date a new survey attached to the old affidavit was filed by Johnson, and approved. Payment was made and a certificate was issued. Had Johnson made another affidavit as of any date subsequent to July 21, 1871, and attached it to the new survey, there could hardly be a question touching the validity of the title evidenced by the certificate of purchase. But, unfortunately, the old affidavit was used in making the second application, and the question arises whether the mere use of the old instead of a new certificate will destroy the effect of the certificate. In my opinion, the truth of the statements in the affidavit accompanying the record survey, upon which the certificate rests, must be tested by the conditions existing *after* the rejection of the first application and survey. In other words, the affidavit which was used on both applications, must be treated as a new application made subsequent to the time of such rejection. It should be measured by the same standard and tested in the same crucible as if it was an entirely new affidavit bearing date subsequent to July 21, 1871. In fact it must be viewed as having been made on September 9, 1873, when the surveyor-general sealed it with his approval, notwithstanding his knowledge of the original conflict with the McGriff survey and application. It was so treated and tested by the surveyor-general, and I cannot see why this or any court should adopt another rule of interpretation, harsh in its rigidity and unjust and inequitable in its effect on the rights of persons who were lulled into fancied security by the muniment of title granted by an agent of the state. I am aware that equitable considerations cannot be invoked to avoid the consequences of willful

perjury committed by an applicant to purchase state lands. I am fully cognizant of rules which place subsequent purchasers in the shoes of the applicant with no greater modicum of equitable or legal rights than he possessed. ·But the law 'respects form less than substance,' and, in my opinion, it is only by a rigid adherence to form, and by making all subsequent proceedings relate back to the time the affidavit was made, that the plaintiff, who slept the sleep of indifference, carelessness, and negligence for thirty years, can now be permitted to take not only what he then claimed, but also that which Johnson admittedly possessed and which others have innocently acquired. The conduct of Johnson in failing to make any claim to the island or any effort to oust Waters from his island home may have induced the latter's slumbers, but such conduct most eloquently attests that Johnson meant to tell the truth in 1870 and in 1873, and his constant belief that he had done so. The penalties of perjury are entailed only by those who intentionally swear to an untruth, and the circumstances of this case would certainly acquit Johnson of intentional wrong. The earmarks of fraud are evidenced by acts indicating a willful intent to profit by its perpetration. Looking at the substance of things, and brushing aside all films and cobwebs of technical construction, the conduct of the affiant clearly demonstrates that he neither intended to defraud the state nor deprive the plaintiff of his land. If he ever entertained such intention his conduct was incomprehensible, for, during the subsequent years of his life he made no attempt to profit by his fraud or reap the reward of his perjury. Under these conditions it is indeed a harsh construction which results in reproach to his memory and spoliation to his successors. In my opinion such construction is unnecessary, and the more charitable and equitable interpretation is most reasonable, and hence I am firmly convinced that rules of law as well as considerations of justice demand the reversal of the judgment.''

We are of the opinion that the construction which is thus placed upon the Johnson certificate is as reasonable as it certainly is equitable. It leaves to plaintiff and defendants their possessory rights to the lands which they were actually occupying. For which reason the foregoing opinion is adopted and approved as the opinion of this court, and the judgment appealed from is reversed.